**Merle M. KOST, Plaintiff and Appellee,**

v.

**Karen M. KOST, Defendant and Appellant.**

**No. 18101.**

Supreme Court of South Dakota.

Considered on Briefs Aug. 31, 1993.

Decided April 20, 1994.

---

John F. Cogley of Morgan, Theeler, Cogley and Petersen, Mitchell, for plaintiff and appellee.

E. Steeves Smith of Tinan, Smith & Bucher, Mitchell, for defendant and appellant.

MARTIN, Circuit Judge.

Karen M. Kost (Karen) appeals a judgment and decree of divorce from Merle M. Kost (Merle). She appeals the granting of

primary custody of a child (Amy) to Merle, the division of property, the award of attorney's fees to Merle, the denial of rehabilitative alimony to her, and the child support required of her.

## FACTS

This action was commenced on June 4, 1990 by Merle. Karen answered and counterclaimed. The trial commenced on December 17, 1991. During this eighteen month interim numerous hearings transpired by virtue of the inability of the parties to get along, the change of counsel for Karen, and the special needs of their child, Amy, born handicapped and retarded on February 10, 1986. Further, tension between the parties increased because of Karen's withdrawal of her verbal consent of settlement on March 10, 1991, which was the day before an earlier trial date. Thereafter the parties could not reach a settlement. An attorney was appointed for the child by the court on July 9, 1991. As stated, the actual trial commenced on December 17, 1991, and lasted three days. The trial court issued two memorandum decisions, the first on June 22, 1992, regarding custody, visitation, child support, and health costs; and the second opinion on July 8, 1992, regarding property division.

The parties were married on July 6, 1979. It was the second marriage for both of them. Karen had a daughter by a previous marriage, who was eight years old at the time of the marriage and continued to live with the parties until she became sixteen years of age. Merle is forty-eight years of age. Karen is forty-six years of age.

At the time of the marriage Karen was employed full time as a secretary at Job Service in Aberdeen, South Dakota. She worked for Aman Collection Agency from 1964 through 1968 and as an accounting clerk from 1969 through 1973. She did not work from 1974 through 1977 because of the birth of her first child and then worked from 1977 until she married Merle. She is a high school graduate with one year of business college in secretarial studies. She quit her job when she married Merle and did not work during the marriage. Karen was diagnosed with multiple sclerosis in her early twenties, but has had only minor problems and is able to work. At the time of trial Karen had recently started a business office careers program at Mitchell Vocational Technical School. This can be a one or two year program, but Karen feels she will need two years. Her schooling is financed through grants from the Job Training Partnership Act. Merle has a bachelor of science degree in agronomy and has been employed by the Soil Conservation Service for twenty-five years. His annual salary is $42,266.

The parties' one child was born on February 10, 1986. In October 1986, the parties learned that Amy was handicapped and would be retarded, and this news was devastating to both of them. In November 1987, Dr. William Sorrels described Amy as a significantly handicapped and developmentally delayed little girl with a small head known as microcephaly and meeting none of what would be considered her normal developmental milestones past about age six to seven months. He assessed the degree of her developmental delays as serious to profound. In a letter dated December 23, 1988, Dr. Jerome M. Blake described Amy as a multi-handicapped little girl who is globally developmentally delayed, has poor physical growth and is starting to show some autistic features. When she was between eighteen and twenty-four months of age, Amy developed a condition known as aerophagia or air swallowing which is a condition frequently seen in children who are not stimulated. She also developed bruxism or teeth grinding which is another self-stimulating behavior. By virtue of her condition Amy will need supervision and care for the rest of her life.

Regarding their child, Karen was the primary caretaker for the first twenty months. Merle would go back to work in the evenings and also work on the weekends. Karen did the housework and took the child for walks. However, Karen admits that Merle assisted during the evenings and was active in parenting the child. In January 1988 the school district became involved in assisting for the caring of the child. It started a feeding program for the child which was to start Amy eating solid foods to help develop her speech, language, and her oral motor activi-

ties. The evidence shows a reluctance by Karen to do this notwithstanding being shown repeatedly how to do it. Amy did not make progress. The school district staff starting going to the home on lunch hours between two and five times per week. Eventually in the fall of 1989 the district started feeding the child at school because she wasn't being fed properly at home. The district also recommended that the child not be "sat" in front of the t.v. and left there, that she be bathed in the bathroom, that her diapers be changed in the bedroom, and that she be fed in the dining room and kitchen the same time as the parents. All of this was designed to assist the development of the child. This, however, was not done by Karen. In October 1989 Amy was evaluated at Meyer Rehabilitation Institute in Omaha. The evaluation revealed that the child had reached a new low as to her level of stimulation and that more training of the primary caretaker was necessary. In March 1990 Merle started taking an active role in caring for Amy. He cooperated with the school district and became visibly aware of the lack of the child's development and the shortcomings of care by Karen. Since April 1, 1991, Merle has been the primary caretaker of this child.

Physicians, nutrition experts, speech therapists, and psychologists all testified as experts at the trial. Their testimony revealed that Karen has an aggressive personality, showed a lack of interest in the child, and failed to follow the recommendations made to assist in caring for the child. On the other hand, they found Merle to be much more devoted to the child and cooperative with the experts to necessarily address the medical needs of the child. To insure the maximum development of the child, Merle should be the primary custodian.

## ISSUE I

DID THE TRIAL COURT ABUSE ITS DISCRETION IN AWARDING JOINT CUSTODY OF THE CHILD WITH THE PRIMARY PHYSICAL CUSTODY TO BE WITH MERLE?

■ The primary consideration in deciding child custody is determining the best interests of the child. *Kappenmann v. Kappen-*

*mann,* 479 N.W.2d 520 (S.D.1991). The trial court is vested with broad discretion in deciding questions of child custody. Its decision will only be reversed if there was a clear showing of an abuse of discretion. *Anderson v. Anderson,* 472 N.W.2d 519 (S.D.1991). Both the credibility of the witnesses and the weight to be accorded to their testimony is for the trial court to determine. *Mellema v. Mellema,* 407 N.W.2d 827, 831 (S.D.1987). The evidence clearly shows that the best interests of the child will be served by Merle as the primary physical custodian. We find no abuse of discretion and therefore the custody determination is affirmed.

## ISSUE II

DID THE TRIAL COURT ABUSE ITS DISCRETION IN DIVIDING THE MARITAL PROPERTY?

■ This Court has consistently recognized the principal factors the trial court is to consider when making an equitable division of the marital property as: (1) the duration of the marriage; (2) the value of the property; (3) the ages of the parties; (4) the health of the parties; (5) the parties' competency to earn a living; (6) the contribution of each party to the accumulation of the property; and (7) the income-producing capacity of the parties' assets. *Kanta v. Kanta,* 479 N.W.2d 505 (S.D.1991). This Court will not disturb a division of property unless it clearly appears the trial court abused its discretion. "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Kanta,* 479 N.W.2d at 507. Exactitude is not required of the trial court in the valuation of assets in a dissolution proceeding, it is only necessary that the value arrived at lies within a reasonable range of figures. The only time this Court will interfere with a trial court's valuations is when they are clearly erroneous or where assets are completely overlooked by said court. In the absence of a stipulation as to the value of marital assets, the parties must produce hard evidence as to those values other than their own personal opinions. The trial court, however, is not required to accept either party's

proposed valuation. *Schwab v. Schwab*, 505 N.W.2d 752, 755 (S.D.1993). Further, a trial court's division is not bound by any mathematical formula. *Johnson v. Johnson*, 471 N.W.2d 156 (S.D.1991).

█ Both parties now agree that the total value of the marital assets is over $96,000. The trial court granted Merle over $68,000 or approximately seventy-one percent and granted Karen over $27,000 or approximately twenty-nine percent. The parties now also agree that the trial court assigned an incorrect figure to the civil service retirement of Merle. The $16,589 figure represented the fund reduced to present value. The amount contributed by Merle during the marriage was $27,318.80. As stated, both parties agree · that trial court's valuation was contrary to settled law. *Kanta, supra.*

Based on the above, we feel the trial court was incorrect and did abuse its discretion regarding the division of marital property. Therefore, we reverse and remand the property division so that an equitable division may be made.

## ISSUE III

DID THE TRIAL COURT ABUSE ITS DISCRETION IN AWARDING MERLE ATTORNEY'S FEES?

█ An award of attorney's fees is within the sound discretion of the trial court. *Clarke v. Clarke*, 478 N.W.2d 834 (S.D.1991); *Kanta, supra.* The factors that a trial court should consider in awarding attorney's fees are "the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case." *Fox v. Fox*, 467 N.W.2d 762, 768 (S.D.1991).

█ The trial court required Karen to pay $8,039 of Merle's attorney's fees and did so based on a finding that Karen unreasonably increased the time spent on the case. The portion of Merle's attorney's fees that Karen was required to pay was the amount of additional fees and costs the trial court found were incurred by Merle because the matter was not tried on the original March 11, 1991, trial date. The trial court concluded that had the trial been held as scheduled commencing March 11, 1991, Merle would not have incurred certain attorney's fees and costs and Karen was responsible for the fact that the trial was not held as originally scheduled. The trial court found that Merle's attorney's fees and costs totalled $17,756.19. Of that amount $6,717.47 was incurred prior to March 14, 1991 and it could be anticipated that had the matter been tried commencing March 11, 1991, there would have been another $4,000 in attorney's fees and that Merle's attorney spent additional time resulting in an additional $7,039.49 in fees and costs. The trial court further found that Karen was responsible for the $1,000 charged by the attorney appointed to represent Amy and that this amount was to be deducted from her portion of the marital estate.

The relevant standard of review was adequately restated in the *Matter of Estate of Gibbs*, 490 N.W.2d 504, 507 (S.D.1992):

[T]his court will not set aside a trial court's findings of fact unless clearly erroneous. A finding is not clearly erroneous unless the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed by the lower court. Additionally, we recognize all conflicts in the evidence must be resolved in favor of the trial court's findings.

The credibility of witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we accord the trial court some deference based on its observations of the witnesses and the evidence. (citations omitted).

The trial court found that Karen had exhibited an obstructional-type of attitude resulting in the necessity of incurring far more attorney's fees, out-of-pocket expenses and costs than should normally be attributed to this particular cause of action. The court further found that such posture by Karen had been willful in nature, although the court did acknowledge that a portion thereof related to Karen's inability to make a decision. The trial court was in a far better position than we to determine the credibility and demeanor of a witness. Additionally, we must resolve all conflicts in the evidence in

favor of the trial court's findings. Although we do not argue with the trial court's finding in this regard, this is not the only factor in the determination of awarding attorney's fees. The other factors of relative property worth, relative incomes, and liquidity of the assets, when considered, make the awarding of attorney's fees an abuse of the trial court's discretion. Therefore, the awarding of $7,039.49 is reversed and each party will pay their own attorney's fees and costs of litigation. The $1,000 in fees paid to the child's attorney was paid out of the assets of both of the parties and therefore is no longer an issue.

## ISSUE IV

DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING KAREN KOST EITHER PERMANENT OR REHABILITATIVE ALIMONY?

■ In determining whether the trial court abused its discretion, the property division and alimony are reviewed together. *Wallahan v. Wallahan,* 284 N.W.2d 21 (S.D. 1979); *Studt v. Studt,* 443 N.W.2d 639 (S.D. 1989); *Strickland v. Strickland,* 470 N.W.2d 832 (S.D.1991). Because we have determined that the trial court abused its discretion regarding the division of property, we also remand the alimony issue to the trial court, making no decision as to whether an alimony award, in any form, is appropriate.

## ISSUE V

DID THE TRIAL COURT ABUSE ITS DISCRETION FOR NOT DEVIATING FROM THE CHILD SUPPORT GUIDELINES IN DETERMINING AN APPROPRIATE CHILD SUPPORT AMOUNT TO BE MADE BY KAREN TO MERLE?

The trial court set a child support figure in the amount of $116 per month, and in addition, Karen is to pay twenty percent of all uninsured and deductible medical expenses for the child. Karen argues that the trial court should have deviated from the child support schedule pursuant to SDCL 25-7-6.10(2) which provides for a deviation when, "any financial condition of either parent would make application of the schedule ineq-

uitable." Karen argues that Merle earns a substantial wage of $42,000 per year, that she is unemployed, unemployable and attending school on a full-time basis in order to improve her income producing capabilities, and that the trial court should not have imputed her income at minimum wage pursuant to SDCL 25-7-6.4.

■ Karen testified that she made applications at six places in the summer of 1991 without obtaining employment and that she also had her name in at Job Service. However, she also testified that there were several jobs available in Mitchell, for which she was qualified, but then decided to go back to school instead of applying for these jobs. It was her choice to attend school rather than become employed. Further, the evidence showed that her physical disability does not prevent her from becoming employed.

This Court has a long and consistent history requiring the parents to support their children. Children are "wards of the Court." *Houghton v. Houghton,* 37 S.D. 184, 188, 157 N.W. 316, 317 (1916). The courts in South Dakota are entrusted to be the guardians of the children and to protect their welfare. *Jameson v. Jameson,* 306 N.W.2d 240 (S.D. 1981); *Blare v. Blare,* 302 N.W.2d 787 (S.D. 1981); *Houghton, supra.* Parents are obligated to provide support for their children. This obligation is not only a matter of public policy, but is also statutory. SDCL 25-5-18.1; SDCL 25-7-6.1. This Court has stated that a parent's duty to support his children is *paramount* and other debts of the parent are *secondary. Park v. Park,* 309 N.W.2d 827 (S.D.1981); *Donohue v. Getman,* 432 N.W.2d 281 (S.D.1988); *VanderWoude v. VanderWoude,* 501 N.W.2d 361 (S.D.1993). This also includes obligations resulting from remarriage. *Donohue, supra; Brunick v. Brunick,* 405 N.W.2d 633 (S.D.1987). Where child support is concerned, the child's interest is the *primary consideration. Regynski v. State of Ariz.,* 414 N.W.2d 612 (S.D.1987).

How then does this paramount obligation square with the desire to improve one's employment status? Should a parent be able to alleviate himself from his child support obligation while attending school to improve his

employment status? We must answer this in the negative. This Court has consistently held that the first obligation of any parent is to provide child support, assuming he is physically and mentally capable. To hold otherwise would be to open the floodgates and allow parents who have child support obligations to circumvent these obligations under the guise of returning to school to enhance employment possibilities. If the situation were reversed and Karen had primary custody of the child, would this Court allow Merle to go back to school, under the guise of wanting to become a doctor or lawyer, with a request that his child support be alleviated until he graduates and thus in a better economic position to support the child? We do not think so. This is not to say that a parent cannot return to school or in some other fashion enhance employment possibilities, but it is to say that his child support obligation will not be alleviated by virtue thereof. Whatever a parent does with his time and money after he has paid his child support is his business, but the child support obligation always comes first.

■ This Court has enforced child support obligations by civil contempt. *Hanisch v. Hanisch,* 273 N.W.2d 188 (S.D.1989); *Thomerson v. Thomerson,* 387 N.W.2d 509 (S.D.1986); *Johnson v. Johnson,* 451 N.W.2d 293 (S.D.1990). Further, in contempt hearings when faced with the defense of "inability to comply" this defense fails unless a parent can show he has complied with the court's order "to the fullest extent of his ability." *Nauman v. Nauman,* 320 N.W.2d 519, 521 (S.D.1982); *Bailey v. Bailey,* 77 S.D. 546, 95 N.W.2d 533 (1959); *Johnson, supra.* A parent cannot voluntarily create the disability for the purpose of avoiding such payment and his inability to comply must be without fault on his part. *Simmons v. Simmons,* 67 S.D. 145, 290 N.W. 319 (1940). A parent must seek suitable employment and must do his best to avoid the failure of his business. *Nauman, supra; Johnson, supra; Herndon v. Herndon,* 305 N.W.2d 917 (S.D.1981).

Karen's schooling is financed with grants, not loans. Her obligation is $116.00 per month or less than $4.00 per day. At minimum wage, she need only work one hour per day to meet her support obligation. Karen has failed to take advantage of job opportunities for which she was qualified, and of her own free choice went back to school. Therefore, she has no basis upon which to request a deviation from her child support obligation. In fact the trial court could have considered deviating by virtue of Karen's voluntary act which reduced her income. SDCL 25–7–6.10(10). The trial court did not abuse its discretion by imputing Karen's wage pursuant to SDCL 25–7–6.4, thus we affirm on this issue.

Affirmed in part, reversed and remanded in part.

MILLER, C.J., and SABERS and AMUNDSON, JJ., concur.

HENDERSON, J., concurs in part, concurs in result in part and dissents in part.

MARTIN, C.J., for WUEST, J., disqualified.

HENDERSON, Justice (concurring in part, concurring in result in part, dissenting in part).

### CONCUR IN PART

I hereby vote to concur on Issues 1, 2, and 5.

### CONCUR IN RESULT IN PART

Although Karen Kost backed out of a settlement and willfully prolonged this action without good reason, she cannot afford to pay such an award. She simply does not have the money available. *See Radigan v. Radigan,* 465 N.W.2d 483, 487 (S.D.1991) (relative financial condition of the parties is a consideration in awarding attorney fees). Hence, the trial court abused its discretion. *Schmidt v. Schmidt,* 444 N.W.2d 367 (S.D. 1989).

### DISSENT IN PART

Karen was denied both permanent and rehabilitative alimony. Prior to her marriage to Merle, she was diagnosed with multiple sclerosis and participated in full-time employment. She did not work during her marriage of almost eleven years. Shortly after

this action was instituted, Karen began job re-training at Mitchell Vocational Technical School. Per testimony, this will probably take two years to complete. I vote to grant her rehabilitative alimony which she truly deserves. However, the specific amount of rehabilitative alimony should be left to the discretion of the trial court. *Johnson v. Johnson,* 471 N.W.2d 156 (S.D.1991).

Under the facts of this case, it appears to be inequitable to leave the alimony open-ended. Karen testified that there were presently jobs available to her for which she was qualified. Nonetheless, a retraining program at the Mitchell Vocational Technical School, which was underway, would enhance her employment opportunity.